Good morning, your honors. Lisa Jackson representing Maria Ferro. Look at the two lawyers, not you. You can figure out very quickly which one likes guns and which one doesn't. Yes. I hope you all like guns. Speak right up. Okay, your honor. Your honors, this case is a civil in-room case about the forfeiture of a firearm collection owned by the claimant, Maria Ferro. And this case is governed under CAFRA. And I would just like to quote for you the legislative history as to how CAFRA came about and the purpose of CAFRA. We've read that legislative history. It's pretty clear under CAFRA that most forfeitures are deemed punitive. Is that your argument? Yes, your honor. But the main thing I want to point out is that we've already read. All right. I'll put it aside. I just wanted to point out it is to protect owners innocent of any wrongdoing. And that's what this case involves. The trial court in this case found that Maria Ferro was innocent of any wrongdoing and she was innocent of knowing that her husband was using her property illegally. And yet the trial court interpreted the innocent owner defense to read that it didn't matter if she was innocent of knowing of the wrongdoing. All she had to do was know about the facts. And under the innocent owner defense, under 983D, it is very clear that you must know of the conduct that gave rise to the forfeiture. She knew her husband had been convicted of a felony. Yes, she did. She knew that he had possession of the guns. Yes, she did. What more did she have to know? Did she have to know the legislative history? Yes. Come on. No, not the legislative history. She needed to know that her husband's conduct. She had to have a legal opinion as to whether those two facts ended up with liability? Yes. Do you have a case that says just that? Yes. One of the closest cases is the Bonhoeff case. It's not exactly on point. The Bonhoeff case does help you. There's no question about that. But are you arguing that she has to prove she's an innocent owner in order to have a proportionality inquiry? No. But the Gartell case, even though it's pre-CAFRA, it goes into the analysis. Why are you arguing about innocent owner? Bonhoeff makes clear that even if you're not an innocent owner, I think in that case the wife was specifically found not to be an innocent owner. That's right. But she had return of all the property based on the excessive fines. They gave her half back, right? Yes. And I want to talk about the Gartell case as well. The Gartell case, even though it's pre-CAFRA, the court found, the Ninth Circuit found that because the wife may not have known of the husband's illegal conduct, that the case needed to go back. And the court specifically said that the prosecutor needed to prove that the wife knew about the illegal transactions of the husband. Now, that wife in that case knew that the house had been purchased with checks. And yet they found that because she did not know about the illegal transactions, and that's just how the court phrased it, that it had to be shown that the wife knew about the illegal transactions of the husband because he was laundering the money to purchase the house. So that was the burden on the government. And here, the 983-D, innocent owner defense, is very clear. If you don't interpret conduct as illegal conduct under 983-2A-I and double I, then double I becomes illogical. Because if you did not know of the conduct giving rise to the forfeiture or upon learning of the conduct giving rise to the forfeiture, you did all that was reasonably expected to terminate the use of the property, well, double I becomes illogical because why would you ever try to stop conduct on your property that's being used illegally if you don't know that it's being used illegally? Let me ask this. This collection of weapons was acquired during the Pharaoh's marriage? Yes, it was. So it's subject to California community property law? Yes, but there was a transmutation in 1992, and the government stipulated that that transmutation was effective. This was during Mr. Pharaoh's trial? Before he was convicted? Before. But Mr. Pharaoh transmuted all of his possessions, the collections, the different collections, to his wife. And Maria Pharaoh's understanding of why all of his wealth was given to her completely, it was that he was not doing well. His health was not doing well. She testified to that. Regardless of the circumstances, you said something that I'd like you to pin down, and that is that the government stipulated that in 1992, pursuant to California law, which allows the transmutation of community property into the separate property of one of the spouses. Yes, Your Honor. And that is specifically exempted from any gift tax consequences also.  So these guns in the collection, I'm not talking about the contraband guns and the machine guns and all that. The guns in the collection, you claim, and I want you to tell me where I can find this in the record, was stipulated by the government to be the separate property of Maria Pharaoh as of 1992? Yes. Where is that in the record? On page 142 of the second volume. Of Excellence of Record, right? Yes. And specifically page 144. Actually, the stipulation starts on 142. These were the stipulated facts for trial. And Maria Pharaoh in pro se and the government stipulated paragraph number four, specifically on 143. That's on or about May the 2nd, 1992. Robert Pharaoh conveyed to claimant all of his property and possessions, including the defendant items. Robert Pharaoh did so because he was awaiting a jury verdict in a pending state criminal matter and believed that a guilty verdict would hinder his ability to own firearms. That answers exactly one-half of Judge Baez's question. And I have the same question, and I'll repeat what I think is the second half. Can you show me where the government stipulated that as of May 2, 1992, the defendant weapons were the sole property of Maria Pharaoh? I think that was the second part of your question, Judge. Yes. Where it is the sole? Yeah. In 1992, they were transmuted. No, no, no, no. Where the government stipulated that as of May 2, 1992, the defendant weapons were the sole property of Maria Pharaoh. Where do we find that in the record? All right. Part of the argument here, if you don't want to accept. We're not looking for right now. You may have an argument by operation of law. I don't know. Right now, you told us that the government stipulated that this was Maria Pharaoh's separate property. That's what we're looking for. Now, if it's not in the record, tell us. If it is in the record, tell us where it is. It's in the opening brief. This is a stipulation? Well, it states on the record that the government states on the record that he, that the. . . Okay. Where are we talking. . . Transmutation is. . . Where are we talking about now? Which brief? The opening brief. The blue brief? Yes. Okay. What page? The opening brief is. . . This is the government's opening brief? No. My opening brief. Brief of appellate. This is yours. Yes, and on page 30. By the way, it should have been red. Minor item. All right. Okay. Tell me where it is in the brief. Page 30. There are some citations as to when, between the government and the court. Page 30 to where? Page 30. And up at the top, the government says there is a stipulation in this case that the transmutation was effective. The court says, well, does that mean under the law? It means that this was community property, and he's now transferring his interest in community property. The government says yes. So now she's the owner of all the property, and the government says, correct. The government has admitted clearly that she is the owner. And where did that conversation take place, or where did that dialogue take place? At the trial level. At the trial. On the innocent owner. Where is it in the record? Are the citations? It is at ER 41 through 42. Okay. Got you. Thank you very much. And I would just like to get back to the innocent owner defense, because it's so important. And I tried to bring into my briefs husband and wife cases, because those are somewhat unique cases. So Van Hoff is your case, isn't it? Pardon me? Van Hoff is your case, isn't it? Well, like you said, Your Honor, that's in the excessive fines. It's very, very similar. Gartell, even though it's pre-CAFRA, it does support the fact that the wife has to know. And this case is not like a mafia wife case or where the wife, it's obvious she would have known, or a drug dealer's wife. These guns were purchased by the Farrells with hard-earned money. They earned this money. They bought the collection together as an investment, a lifetime investment. And it rose, even though they didn't pay that amount, it has risen over $2.5 million in value. And the main point under the innocent owner defense is that the only way you can read it, because under the facts of this case, Maria Farrell, she didn't have her head in the sand. She wasn't willfully blind. The facts of this case show her, she knew her husband, owned two firearm licenses, two Federal firearm licenses. She, in 19- Which he lost when he was convicted. Yes, but she doesn't know that. So in 91, when he was arrested for having explosives at his Pomona poultry plant, the ATF came to their house. They came in the house. They found all of the guns that they had previously, I mean, that he owned. These are the same guns that were there in 2006. What is it you would like this court to do? What's the relief you're seeking? To find that Maria Farrell is- We don't make findings. We're not a trial court. To bring it back to the trial court. You want us to remand to the district court. Yes. For what? Because the judge- Not what the judge did wrong. You want us to order a remand to the district court to do what? To have the innocent owner defense interpreted correctly. And also the excessive fines was erroneously applied as well. You have to be careful in answering this question. If we remand it and the district court determines that Maria Farrell is not an innocent owner, do you lose? Under that- Yes or no, do you lose? Yes, under that issue. Think carefully what you're saying, Ms. Jackson. After reading Von Hauth. Well, no. You're right. Excessive fines, she's still- She's still entitled to an excessive fines ineligible. That's right. Okay. I think we got your argument. All right. The total value of the property is what, again, for the benefit of the audience? The expert- It's just a number. Over 2.5 million. Okay. These are investment guns. All we asked was for the number. All right. Thank you. Would you like to hear about the excessive fines argument? Why do you think the district court properly informed to perform another excessive fines analysis would come to an excessive fine analysis of greater than 10 percent? Because the trial court analyzed- He didn't restrict- The judge did not restrict his analysis to just the offense that gave rise to the conduct. In a forfeiture in rent case, it's the property itself that's the defendant. That's why the defendant here is 1,600 guns. What the trial judge did, he analyzed Robert Farrell's other unlawful acts, like owning the machine guns or the unregistered guns. Under the excessive analysis, it is very clear under the statute you are only to compare the forfeiture, which is the value of the guns, to the offense that gave rise to the forfeiture. The only offense that gave rise to the forfeiture in this case was the felon in possession. It wasn't owning unregistered guns. It wasn't owning machine guns. The only crime, the only conduct that led to the forfeiture was felon in possession. That's the only offense he should have analyzed. But the judge brings in all these other offenses, and the Ninth Circuit and Bonhoeff case say very clearly the only offense that the judge can analyze is the offense that gave rise to the forfeiture. They can't bring- Will the record tell us as to the collectible guns, which are the part of the Farrell collection- Yes. How many of those guns were operable at the time of the arrest? I don't know how many were operable, but I know that they would not have fired them. Those- Who would not have fired them? The owners, the Farrells. If you fire the guns, they lose their values. These are collectibles. The only purpose for purchasing these guns is for investment purposes. They're like a coin collector or a stamp collector. They were in boxes. There was testimony. They were in boxes like a collector. You don't use these guns.  And you might buy them for $1,500, and about five years, they're worth $3,000. Were they all capable of firing? I'm not sure how many. They didn't have that in the record. Okay. That's fine. It's not in the record. It's not in the record. Yeah. It wasn't in the record. Do you want to save some time? Yes, Your Honor. I think Roger Hansen would like to discuss the third issue. Yeah. Well, you're a good advocate. Thank you. What a passion. Thank you, Your Honor. I believe my client deserves the property. Thank you, Your Honor. Good morning, Your Honor. Roger Hansen. Chronologically, it seems backward because I would think the issue of whether the house was searched would probably precede whether the guns would be found at all. And I'd like to briefly talk about that because it's clear that the search warrants that was used to finally get into the house on Caffey Way. Were these guns all registered with the police department or the sheriff? I don't know about that. Your co-counsel is nodding her head. The co-counsel. And the government will correct us if we're wrong. Go ahead. All right. It's clear to me that the warrant that was eventually used to get into the Tapia home did not satisfy the dual prongs of Aguilar versus Texas because the client had no personal knowledge whatsoever of anything he talked about. Certainly, he did not know anything about a gun or clothing being at the house at the time the search warrant was sought. So the question is, is there a totality of circumstance analysis that would save this? And I think it's important to take a look at Illinois versus Gates, which is a famous totality of circumstances case. Did you file a brief in this case? Yes, I filed a brief along with my name's on the brief. The brief of appellant? Yes, lower right-hand corner. Okay. Okay, go ahead. All right. The famous Illinois versus Gates case was a unique set of circumstances. Let me just point out, Roger Hansen is an old-timer here. He's been doing this work nothing longer than I have. I don't believe that. And he's had many successes. I mean, he looks older than I do. I think I'm older than he is. So go ahead, Roger. He shows up here about once every ten years. The thing I want to emphasize is that Illinois versus Gates is a very unique set of circumstances. An informant called into the small-town police department and talked about how the Gateses trafficked in marijuana between Illinois and Florida. And it was told that Mr. Gates flew to Florida, and then Mrs. Gates drove the car down, and they switched the cars, and she came back. Anyway, this was obviously something that satisfied neither prong, Vagalar versus Texas, but the police department called the O'Hare Airport in Chicago and found out that, in fact, Mr. Gates had booked a flight to Florida on a certain day, and he was supposed to arrive on a certain airline. So they got that information, radioed it down to Florida, had the police department visit the airport at the time Gates arrived. In fact, he did at that time. They traced him to a hotel, and the Gates car was there and so forth. In other words, what I'm saying to the court is there is a unique set of circumstances that was verified prior to getting the search warrant. Here you have no such thing. You have no verification of anything. You have a bunch of disjoint suppositions and presuppositions that, as far as I'm concerned, they're all weak links in a chain, and that chain cannot be made intact by a bunch of weak links. For example, this Frank Beltrand, certainly no Sunday school kid, he had shot his wife with a gun several times. Luckily, she lived, and she gave information to them that her son had been in the house a couple months before that and seen a Wyatt Earp gun in Mr. Farrow's house. She didn't know anything about Farrow ever having guns in the house except what the child had seen. And then they jumped to the fact that the question is who brought Mr. Beltrand over to the house on Center Avenue. They didn't know who that was. Mr. Sifuentes gave a supposition that he thought maybe Mr. Farrow brought him over, but that was not proven at all. Again, that's supposition. And then the question was, did Mr. Farrow ever bring any food over to the house? That, again, was supposition. And the thing that I wanted to move into then is there was a sealed search warrant issued by a state court, which was the start of this whole thing. And I sought to get that search warrant unsealed, which I successfully did partially prior to the evidentiary hearing before the U.S. magistrate judge. And I learned in that unsealing that a woman supposedly had come to the center location looking for Frank Beltrand. Mr. Sifuentes allegedly went to the door, and the woman says, I'm looking for Frank Beltrand. And they had a conversation and so forth. Sifuentes testified at the hearing that that never, never happened. There was no woman that ever came to that door. So I said to the magistrate judge, I said, look, I said, there's another falseness in this affidavit that's here. I said, I would like to have you, Your Honor, unseal it. He said, well, I can't unseal it. And the interesting thing is I've gone back to the district court or to the U.S. or to the superior court in San Bernardino on a second attempt. And would you believe now they can't even find the warrant? They can't find the warrant that was used to secure this. And so I've had hearings on that. And I said to the judge, I said, you ought to bring the affiant in so I can have him examined by Your Honor. So they brought him in, and the police officer says, I don't know where this woman is anymore. And now they have lost this sealed affidavit. So there's a lot of skullduggery, in my opinion, going on here. And there's really nothing that was offered in this case that was a personal knowledge of anybody. It was total speculation, which was woven together in a seemingly crazy way to get this warrant. And it simply fails, I think, not only clearly fails Aguilar v. Texas, but also it fails. So you're challenging the search of the house? I am, yes, very vigorously. Listen, time's up. And my colleagues expect me to run this train on time. So maybe it's five minutes away from the government to give it to you. All right. Whatever's fair, Your Honor. Is this okay? Yeah, that would be fine, I think. We made a deal. All right. Good morning, Your Honors. May it please the Court, I'm Assistant U.S. Attorney Stephen R. Walsh for the government. Can I ask you one quick question? Absolutely. Can you tell me where Judge Walsh dealt with the search warrant issue? Were in the record that I could find that? I'm not sure that it's in the record, Your Honor. That was an issue raised by the claimants in their appeal. And I'm not sure that they included the order in their ---- They raised it in their brief. Yeah, I'm not sure it's included in their excerpts of record. I'm pretty sure it's not included in the government's excerpts of record. Okay. I can look for it. Don't let me dissuade you from the order. Were these guns registered with the sheriff? That's another good question. I think I know the answer to that question, but I cannot tell the Court if it's in the record. I believe that there was testimony by the case agent that none of the guns were registered. In fact, I distinctly remember that there was testimony from one of the case agents that they had done a search in the databases that ATF, the Alcohol, Tobacco, and Firearm, uses to determine whether any guns were registered to either the claimant, Maria Farrow, or her husband, Robert Farrow. They'd be registered with the sheriff. That's what you do here. I mean, in L.A. County, the LAPD doesn't issue gun permits. The sheriff does. He gives them to judges. So be careful. They have a record of all of them. There was no record found. Unfortunately, I remember that from doing the trial, but I'm not sure that it's in the excerpts of record that we attached. So I'm hesitant to represent that because I can't point to a place in the record where it appears. The other question that the court had asked, one of the judges had asked, is whether all these guns were functional. I'm not sure there's anything specific in the record about that either, except that I believe the definition of a firearm in Title 18 is that it is capable of projecting or forcing out a projectile. And there was testimony from at least one of the ATF agents who had inspected all of the firearms that they were, in fact, firearms within the meaning of Title 18. So on that basis. And also, there certainly is no indication that any of the firearms were not operable. I think that's sort of an issue that was kind of assumed by both sides, that they all were. Certainly that was our assumption, and I don't believe there was any evidence to suggest that they were not. They're not getting the guns back, right? They will not get the guns back, no, under any circumstances. So the question on forfeiture is whether the court conducted the proper analysis under CAFRA, correct? Correct. The innocent order, yes. Yeah. And whether its proportionality analysis was correct in awarding her 10 percent of the value. Correct, yes. What will happen to the guns? Will they be put up for auction? No. They won't be sold either. They'll either be put into official use, which in terms of this case, means that they'll either be placed at the ATF Museum in Washington, where they have a giant collection of firearms. And if they're not eligible for that, they'll be destroyed. Now, I'm not sure we have a case on point, but the Von Hoff case, are you familiar with that? Yes, Your Honor. I think Second Circuit. I believe it is Second Circuit, yes. Von Hoff suggests that even if you're found to be not an innocent owner, you're still entitled to a proportionality analysis, correct? Correct. And did the district court found that she was not an innocent owner? That's correct, yes. The district court failed to make a finding on whether she was an owner, but decided that it didn't need to decide that because she wasn't innocent. So the ultimate conclusion was she was not an innocent owner, yes. Mr. Wilk, maybe I'm just obsessed with the bottom line. Yeah. But it seems to me from your answers that if the guns, if we remain to the district court, the district court would find that a greater percentage should be returned to Mrs. Ferro, right? It can't be done because you're telling me the guns will go to the ATF museum or will be destroyed. So is the ATF museum going to pay for those guns? No. Where's the money going to come from for her to even get 10 percent? In the, what I hope is the unlikely event that this Court approves the order of the district court, the district court, because of the answer I just gave, he asked me the same question. That's why the district court gave the government the option of either paying money or giving back a certain percentage. So that if we were to remain in the district court, were to go from 10 percent to another sum, funds of the United States of America would be paid to Ferro either in 10 percent, which would be $250,000, or if we say 50 percent, it would be $1.25 million. That's correct. All right. Thank you. She gets a check. She would get a check, yes. Okay, but not the guns. Correct, and that's just a matter of policy because the government, and that's also because of the district court's decision. The district court certainly could have ordered the government to return a portion of the firearms, but didn't because of those policy considerations. So you say these guns are destroyed? Many of them likely will be destroyed. This is, well, the NFA, the National Firearms Act guns, the machine guns, and all that stuff will definitely be destroyed. The collectible firearms, I understand that quite a few, a lot of these collectible firearms, will be placed at the ATF Museum and will not be destroyed, not necessarily because of their value, but because of their rarity. There's not that many of them out there, and they have a large collection. Could she take that check and start another weapons collection? She could so long that one of the problems she's going to have there is that Mr. Ferro has come back to the family home, that's the evidence that we've received, and there are provisions forbidding him from having even constructive possession of firearms. So she could own firearms, but we would suggest she cannot keep them. She could keep them in any warehouse under her own name, right? She'd have to keep them somewhere away from Mr. Ferro, yes. She's not a prohibited person because she's not a convicted felon. Defend the proportionality analysis that district court entertained that resulted in 10%. Defend it? Yeah. Explain it. I take it you're asking us to affirm. Oh, no, Your Honor. Actually, I'm asking the court to undo the finding of excessiveness and hold that based on the record. Okay. What was wrong with, in your view, of the excessivist analysis that the district court undertook? The main problem with the district court's analysis is that the court declined to find or found that these firearms were not instrumentalities of the underlying offense that triggered the forfeiture. And he did that, the court did that basically looking at Bajikasian and finding that there's this difference in the Bajikasian opinion, the Austin opinion, Supreme Court cases. There's a distinction between property that is the subject of the offense and the means of the offense. Bajikasian is pre-CAFRA, isn't it? Correct, yes. To the extent it's inconsistent with CAFRA, CAFRA would apply. Yes, but I don't think there's any inconsistencies because what CAFRA did, this successiveness provision in CAFRA, which is Section 983G, actually codified the holding in Bajikasian and set out the rule. In fact, it lifted it verbatim that the question is whether the forfeiture is grossly disproportional to the gravity of the underlying offense. The government's position is she gets nothing. Correct, yes. For a couple of reasons. No firearms, no money. Correct. For a couple of reasons. And the main one being that firearms are an instrumentality. They're a means of the offense of possession of a firearm. And I'm not going to go into the detail I went to in the brief because we covered that pretty extensively. But I think one thing that does, I think, merit some additional discussion is this difference between the subject of the offense and the means of the offense. And when you look at the cases on those issues, you've got Bajikasian and this Court's decision in Thurman Street where the Court found that those were not instrumentalities of the offense. What's important from the government's point of view is that in both of those cases, both the Supreme Court and the Ninth Circuit in Thurman Street both acknowledged the continuing validity of an instrumentality exception to the Eighth Amendment. Neither of them said there is no such thing as an instrumentality exception. On the contrary, they said there is such a thing, but it doesn't apply to those cases. And the difference between those cases and this case is that in those cases, the thing that the government was trying to forfeit was not essential to the offense, the underlying offense. In Bajikasian, the crime was not having money or even trying to take it out of the country. The crime was failing to report that he had the money. In Thurman Street, the crime was not having the house that was being forfeited or the proceeds of the sale of the house. The crime was lying in the loan application and making structured deposits in order to obtain the loan to get the money that was used to buy the house. If Maria Farrow had taken the guns prior to him being convicted and moved them to a mini-storage and slapped a label on the door of the mini-storage saying, contents herein are the sole and separate property of Maria Farrow pursuant to California Code XYZ, we wouldn't be here. That's true, yes. But in fact, what she did is she didn't even know most of them existed. She had no idea where they were and that they were throughout her house. And she admitted, as part of that stipulation that was referenced earlier, that Robert Farrow was in possession of all of these firearms at the time they were acquired. There was evidence at trial that's referenced in the brief that there was this underground shooting gallery that he built underground in the backyard. Maria Farrow testified that she remembered that being built and that she went down into it shortly after. These guns were used in the shooting gallery, were they? We have ñ those were the guns he had. Well, but we don't know. We don't know. And what about the comment, maybe it's not in the record, of Counsel Jackson saying that these guns would lose value if they were fired? That's probably true. Certainly, a lot of the guns ñ So the shooting gallery really had nothing to do with the collectible guns. It had to do with the contraband guns. We don't know the answer to that, Your Honor, because we don't know. We don't know which ones he shot. Certainly, it's ñ I don't think there's any dispute that many of these guns had never been fired. And it's reasonable to believe that they probably ñ that Mr. Farrow never would have. Certainly, Mrs. Farrow never would have. She testified that the only time she ever handled any of these guns was when her These guns, the ones that are subject to the forfeiture here, are not inherently contraband. Are they? Well, the guns that were contested in this case were not inherently contraband, except with a few exceptions that are not significant here. However ñ Machine guns and all that, they were contraband. Right. But the old guns, the guns that were in individual boxes and all those, they weren't contraband. They were not contraband per se, but they were certainly contraband in the possession of Marie ñ I'm sorry, of Robert Farrow. They were prohibited ñ Some of these guns go back to the First World War and beyond. Yes. I think some of them may be older than that. Some back in the 1800s. Actually, though ñ actually, let me change that. I mean, if you're going to have an exhibit of guns, the ATF, aren't you just encouraging people to go out and buy guns and have them and register them and all that? General. I'm not sure that encourages them. Well, I mean, people see these beautiful things and they want them, you know. I think that's true, Your Honor, but the problem is the losses ñ I look in here and I see an M1 rifle. I'd like to have one for old times' sake, you know. You got any for sale? Unfortunately, no. But maybe we can work out an official use. I don't know. The problem, though, is that the question of whether people are encouraged to buy guns or whether people are allowed to buy guns, there's no problem with that except that convicted felons cannot have guns, and there's a lot of good reasons for that, and Congress has decided that that's true. And the reality in this case, based on the record at trial, is Robert Farrow never stopped. These were his guns. They were never not his guns. He did this transmutation, and according to the stipulation, he did it because he knew or he thought that he was going to be convicted, and he was, and he knew that if he was convicted, it would be illegal for him to possess these guns. So he did this transmutation agreement and said, well, all this stuff belongs to my wife now, and not just the collectibles, all of them. So during the next however long that went, from 1992 until 2006 when they were seized, Maria Farrow didn't just own the collectible guns. She owned the machine guns and the silencers and the rocket launcher tube and the live hand grenade. She owned all of that stuff, and it was on the walls in her house and hidden behind things on the wall. Where the children were. Do you think that the trial judge was correct in considering her ownership of the contraband in determining the 10 percent proportionality? Yes. Yes, I do. Why is that? Well, and that goes back to Von Hoff, because one of the things about Von Hoff said, well, the court should only look at, in term of the excessiveness, the underlying, the crime by which the guns were committed. The problem with that limitation is it's directly in conflict with one of the factors identified by the Bajikasian court of the factors that the court should look at in determining whether it's excessiveness, which is whether the property involved or whether the underlying crime, whether there was involvement in other related crimes. And that's an important factor in Bajikasian, because what it allows to happen in practice in the forfeiture cases is it allows the government to present after the forfeiture trial is concluded evidence of additional criminal acts that don't necessarily support forfeiture, but are relevant to the equitable determination of whether this forfeiture is unfair. Did any of those acts involve Maria Farrow? No, they did not. And that takes us to that culpability issue. How important is the culpability issue? The government would suggest to the court that the whole point of the innocent owner defense is to take that culpability of the claimant into account, because that's all the innocent owner defense is about, whether the claimant had any involvement in the activity or had knowledge of the activity. That, as a matter of necessity, takes into account whether the claimant had any culpability or not. I'm having a hard time understanding why other potentially criminal activity engaged in by Robert Farrow, which did not, you've told me, involve Maria Farrow at all, is properly part of the proportionality analysis. I have to apologize, Your Honor, because I just realized I misspoke. Based on Maria Farrow's own testimony and the transmutation agreement, Maria Farrow did engage in related criminal activity because she was the owner from 1992 until 2006 of all of the NFA weapons. Okay. Other than owning these weapons because of the transmutation agreement, did any of these other criminal activities involve her? Well, no, because the criminal activity here was ñ I can understand why the judge would take the information that relates to Robert Farrow and say you can't have these and you can't be rewarded proportionality or otherwise for these. But I'm having a hard time understanding how that applies to her. Well, it applies to her because she's not an innocent owner. And so under the statute ñ We understand that. Under Von Hoff, that doesn't end the inquiry. Well, but under ñ Though the housewife in Von Hoff was specifically found not to be an innocent owner, correct? But also what's important here, Your Honor ñ Her husband was growing pot in the basement. But this goes back to the nature of the property. Von Hoff involved a piece of real estate, a home, a family home, in which there was no dispute in that case that the wife had a valid, enforced, legally cognizable ownership interest under both State law and Federal law. She was a true owner. She was a half-owner of that property. There was an instrumentality in the commission of the crime because they can't grow marijuana in the basement without a house on top of it. Yes, well, Your Honor, that's true. But it's not an instrumentality. That's a facilitation case for the same reason that the house and the ñ Oh, we have a difference between facilities and instrumentalities? Yes. And that's the distinction that's found in Austin. If you go back to U.S. v. Austin, the reason that the mobile home and the auto shop in Austin were not instrumentalities is because those places were not necessary to the ñ to the criminal offense. And in Von Hoff, that that specific house was not ñ well, it was not essential to the crime of cultivating marijuana. In other words, the crime in Von Hoff was not growing marijuana at that house. The crime in Von Hoff was growing marijuana. That's the crime. Now, the house was used to facilitate that crime, just like the mobile home and the auto body shop were used to facilitate the cocaine sales in Austin, and just like the money was used to facilitate the failure to report in Bazhukasian. There's a difference between that and an instrumentality offense, especially in a situation like this, where it's a possession offense, where the actual possession of the thing is a necessary element. And that brings this case into that same area as Dobson's Distillery, where the underlying crime was the illegal distillation of alcohol. You have to have distillation equipment in order to do that. In J.W. ñ J.W. Grant, I think it is. It's the site ñ it's the case that's distinguished in the Bazhukasian case, where the ñ where the ñ in that case, it was the illegal transportation of alcohol. And there, the Supreme Court found ñ J.W. Goldsmith is the name of that case. There, the Supreme Court found that was an instrumentality case. This was the Bazhukasian court that found this. And the reason that was an instrumentality was because in order to transport ñ in order to illegally transport alcohol, you have to have a vehicle of transport. So it's ñ The Goldsmith case is J.W.S. in your brief? Yes. Citation? Yes, it is. And I actually have it. It's 254 U.S. 505 from 1921. Other types of cases, Calero, Toledo. What would you call a time-honored case? A longstanding. And as a matter of fact, Your Honor, there are ñ in addition to that, the Dobbins ñ Dobbins distillery case is even better because it's from 1877. And there's also Taylor v. United States from 1845, which is also discussed in my brief. This distinction, this instrumentality ñ I want to make it clear that the government is not saying that every in-rem forfeiture is an instrumentality forfeiture. It's clearly not. And the authorities make that clear. The government is not even saying that every in-rem forfeiture of a firearm is necessarily an instrumentality defense. But in this case, where the crime that triggers the forfeiture is possession, illegal possession of firearms by a convicted felon, the firearms are absolutely an instrumentality of the case. And you've got a finding by the Supreme Court in U.S. v. Assortment of 89 Firearms that this forfeiture provision that we're talking about here, Section 924d, is a remedial provision, and therefore, it is a provision that is properly immune from an excessiveness analysis. Your argument is that this is a remedial forfeiture. Absolutely. That it's completely remedial. And that's what U.S. v. Assortment of 89 Firearms. That's what the Supreme Court found. That Section 924d is a purely remedial and not a punitive forfeiture. There's statutory authority to take a collection like this and put it on display in Washington and have people pay to go in and look at it? No. There is statutory authority for the forfeiture, and then the government is permitted by statute to dispose of the property according to law in any legal manner. At that point, it becomes the government's property, and it can do whatever it wants with it. I'm not sure they charge to go into the ATF Museum. I don't know about that. I think that museum actually, I call it a museum and so do they, but I think what it is largely is a collection that the government maintains much like it's similar to the Smithsonian where they want to sort of have one. Let me ask you this. This was community property? At one point, it was. At one point. Yes. And then back when, 10 years or whatever it was, he conveys his community property interest and the collection to his wife. And at that time, does the government consider all of that property that was conveyed? Forget about the silencers and all the rest of it. I mean, was there a list drawn up? No. There was no list drawn up. Right. So does the government dispute that all the legitimate items were his half interest and those were conveyed to his wife? The government contends that under California law, the transmutation agreement extinguished their respective community property interests and caused a separate property interest to Because the agreement says, it didn't just say the firearms. It said all of my property, including my firearms. And a collection of gold coins. Correct. And so at that point, that transmutation, and this is discussed in the government's consolidated answering and reply brief. So why isn't that respected? Why isn't that her property? Well, because there's a distinction between whether it's her property according to state law, which is more of a standing issue, and whether she's an owner, whether it's her property within the meaning of the federal forfeiture statute. And that's a different, as this court pointed out in Lincoln Navigator, the Lincoln Navigator case, that's a substantively different discussion. That's a different issue, whether she's an owner for purposes of state law, which she is. And that was never disputed. So after Robert Farrell's conviction, Maria was in violation of the law by possessing these weapons? I'm not sure why she would be. She may have been. She couldn't have been. Well, she may have been in violation of the law in the sense that she was engaged in a conspiracy to allow a felon to remain in possession of firearms. Yeah, but she was the owner. Right. But she's not a prohibited person. Some of these things even an innocent person couldn't have owned, right? Correct. Live hand grenades, machine guns, et cetera. Yes. Okay. So, yes, she was. Yes. I'm sorry. We keep coming back to that, and I keep misspeaking. I'm sorry. Yes. She was in violation of the law to the extent she was an owner. And has never been charged. And she's never been charged because the government has taken the position that within the meaning of federal law, she was not an owner. That, in fact, Robert Farrell remained the owner and that she was merely a straw or a nominee. Okay. And that's why. All right. Thank you. All right. Go ahead. Just talk fast. Yes, sir. First of all, I'd like to say Maria Farrell denied knowing about any of the machine guns and unregistered guns, and she put it on the record at page 45 through 47. She told us that, yeah. Yes. And also, all the cases cited by the government were pre-CAFRA. Vagikagian and the assortment of 89 firearms, that was superseded by CAFRA and also Austin and Halper. If you shepherdize the assortment of 89 firearms, you'll see that case was superseded. And both Vagikagian and the Thurman case were also pre-CAFRA. And the one issue that the trial court failed to do when analyzing the excessive fines issue was the judge never, ever evaluated Maria Farrell's culpability in any of his analysis, which is very important and was required. Thank you. Thank you, Your Honors. All right. The matter is submitted.
judges: Pregerson, Hawkins, Bea